IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THOMAS RADFORD, #156846, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:13-CV-188-WHA |
| | ) | (WO) |
| | ) | |
| KIM TOBIAS THOMAS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is pending before the court on an amended complaint filed by Thomas Radford ("Radford"), a state inmate, challenging a myriad of conditions and actions taken against him during a prior term of incarceration at the Bullock Correctional Facility ("Bullock").  On August 20, 2013, the court dismissed various claims and defendants from this case.  *Order of August 20, 2013 - Doc. No. 71*.  The defendants remaining in this case are Kim Thomas, former commissioner of the Alabama Department of Corrections, Kenneth Jones, Sandra Giles and Rene′ Mason, wardens at Bullock during the time relevant to the complaint, Lt. Aundra Jackson, Lt. Harvey Ruffin, Lt. Timothy Scott, Sgt. Corey Bennett, Sgt. Michael Oree, Sgt. Dominic Whitley, Sgt. Veronica Baldwin and Officer Martis Penn, Jr., correctional officers at Bullock, Telease Ellison, the laundry manager at Bullock, Edith Miles, the facility's chief kitchen steward, Cynthia

Stubbs and Carrie Sparks, clerical staff at Bullock, and Dr. Tahir Siddiq, the attending physician at Bullock.[1]   The following claims are now before the court for review and disposition:  (1) violations of administrative rules and regulations; (2) denial of access to the courts; (3) retaliatory confiscation of legal materials; (4) inadequate medical treatment for lower back pain; (5) assessment of co-payments for medical treatment; (6) the withholding of funds without due process; (7) invasion of privacy by female clerical staff via hidden surveillance cameras; (8) lack of due process in a disciplinary hearing conducted on April 15, 2012; (9) conspiratorial acts by the defendants; (10) deliberate indifference to safety during a power outage which occurred on September 23, 2011; and (11) conditions of confinement including (i) inadequate laundry services, (ii) provision of one laundry bag, (iii) unsanitary kitchen, dining room, meal preparation and food service, (iv) conditions of showers and restrooms, (v) lack of access to restroom facilities and drinking water for two hours each morning while on the yard, (vi) denial of paper bags and sacks in which to place items purchased from the canteen, and (vii) denial of paper plates for use in the microwave.  Radford seeks declaratory relief and monetary damages for the

---

[1] Radford sues the defendants in both their official and individual capacities.  "[W]hen officials sued in [their official] capacity in federal court die or leave office, their successors automatically assume their roles in the litigation." *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991).  Thus, with respect to Radford's claims against former commissioner Thomas in his official capacity, current commissioner Jefferson Dunn is the appropriate defendant.  As to the personal or individual capacity claims lodged against defendant Thomas, Thomas remains a proper defendant. *Walton ex rel. R.W. v. Montgomery County Bd. of Educ.*, 371 F. Supp. 2d 1318, 1320 n.1 (M.D. Ala. 2005) (new official substituted for official capacity claim but not for individual capacity claim).  Radford also improperly identifies defendant Stubbs as Mary Stubbs when this individual's true name is Cynthia Stubbs.  In the interest of clarity, the court will utilize the defendant's correct name.

alleged violations of his constitutional rights.

The defendants filed special reports and supporting evidentiary materials addressing Radford's claims for relief. The defendants also filed numerous responses to discovery requests submitted by Radford. Pursuant to the orders entered in this case, the court deems it appropriate to treat the special reports as a motion for summary judgment. *Order of March 3, 2014 - Doc. No. 237*. Thus, this case is now pending on the defendants' motions for summary judgment. Upon consideration of these motions, the evidentiary materials filed in support thereof, the sworn complaint, the plaintiff's affidavits and his responses to the defendants' reports, the court concludes that the defendants' motions for summary judgment are due to be granted.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law.").[2]   The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (moving party has initial burden of showing there is no genuine dispute of material fact for trial).   The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof.   *Celotex*, 477 U.S. at 322-324.

Each of the defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact with respect to the claims presented by the plaintiff.   Based on the foregoing, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or

---

[2]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."   Fed.R.Civ.P. 56 Advisory Committee Notes.   Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'   'Dispute' better reflects the focus of a summary-judgment determination."   *Id*. "'Shall' is also restored to express the direction to grant summary judgment."   *Id*.   Despite these stylistic changes, the substance of Rule 56 remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may ... grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."); *Jeffery*, 64 F.3d at 593-594 (internal quotation marks omitted) (Once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or sworn statements], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact.).  This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014).  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Public Education for Bibb County*, 495 F.3d 1306, 1313 (11th Cir. 2007).

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted).  Consequently, to survive the defendants' properly supported motions for

summary judgment, Radford is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil Procedure*. "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Anderson*, 477 U.S. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without

6

specific supporting facts have no probative value.").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (summary judgment appropriate where no genuine dispute of material fact exists).  At the summary judgment stage, this court must "consider all evidence in the record .... [including] pleadings, depositions, interrogatories, affidavits, etc. -- and can only grant summary judgment if everything in the record demonstrates that no genuine [dispute] of material fact exists."  *Strickland v. Norfolk Southern Railway Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004).  What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of*

*the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts....  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. After such review, the court finds that Radford has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants. *Matsushita*, *supra*.

## III. DISCUSSION[3]

### A. Absolute Immunity - Correctional Defendants

To the extent Radford sues defendants Dunn, Jones, Giles, Mason, Jackson, Ruffin, Scott, Bennett, Oree, Whitley, Baldwin, Penn, Ellison, Miles, Stubbs and Sparks in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v.*

---

[3] The court limits its review to the allegations set forth in the amended complaint filed by Radford. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Secretary, Florida Dept. of Corrections*, 502 F.App'x 905, 909-910 (11th Cir. 2012) (plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton County School District*, 300 F.3d 1288, 1291 n. 4 (11th Cir. 2002) (district court correctly refused to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

*Graham*, 473 U. S. 159, 166 (1985).   "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities."  *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, defendants Dunn, Jones, Giles, Mason, Jackson, Ruffin, Scott, Bennett, Oree, Whitley, Baldwin, Penn, Ellison, Miles, Stubbs and Sparks are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities.  *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

## B.  Speculative Claims

With respect to those claims Radford presents claims based on a fear of conditions, actions or maladies which could have, but did not, occur during his incarceration at Bullock, these claims do not warrant constitutional protection.   Mere suppositious

10

allegations that conditions *could* subsequently result in constitutional violations and/or that prison officials *may* at some time in the future act unfavorably towards an inmate fail to implicate a constitutionally protected interest. *Conner v. Sticher*, 801 F.2d 1266, 1268 (11th Cir. 1986) (plaintiff's subjective belief harm may occur provides no basis for relief); *Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (jurisdiction cannot be premised upon mere speculation); *Carter v. Heard*, 593 F.2d 10 (5th Cir. 1979) (Relief is not warranted when "the injury which [plaintiff's] pleadings contemplate is fancied, not real; prospective, not actual; and imagined, not threatened."). Thus, claims based on mere future possibilities are subject to dismissal as these claims are purely speculative and without constitutional implication.

## C.  Respondeat Superior

Radford names former commissioner Kim Thomas as a defendant in this case. Radford asserts that during his term as Commissioner of the Alabama Department of Corrections defendant Thomas was "legally responsible" for conditions, operations and all matters of compliance for each of the State's correctional facilities. *Amended Complaint - Doc. No. 23* at 2. Radford also asserts that defendant Thomas had reason to know or should have known of the conditions at Bullock and the adverse actions taken against him. Thomas, however, denies any personal knowledge or involvement with the claims made the basis of the amended complaint and maintains that he did not participate in the daily

operation of Bullock.  *Kim Thomas' Response to Interrogatories - Doc. No. 130* at 1.  The claims against defendant Thomas entitle Radford to no relief.

The law is well settled "that Government officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior* [or vicarious liability].... *Robertson v. Sichel,* 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ('A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties').  Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S.Ct. 1937, 1948 (2009); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v. Butler County*, 268 F.3d 1014, 1035 (11th Cir. 2001) (A supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir.2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999), citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (42 U.S.C. § 1983 does not allow a

plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129 S.Ct. 1949. Thus, liability for actions of correctional officials at Bullock could attach to defendant Thomas only if he "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [his] actions ... and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

Radford, however, has presented no evidence and the court cannot envision the existence of any evidence which would create a genuine issue of disputed fact with respect to the claims lodged against defendant Thomas. It is undisputed that Thomas did not personally participate in or have any involvement, direct or otherwise, with the claims made the basis of the complaint. In light of the foregoing, Thomas can be held liable for actions of correctional officials at Bullock only if his actions bear a causal relationship to the purported violations of Radford's constitutional rights. To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of defendant Thomas, Radford must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendant] on notice of the need to correct the alleged deprivation, and [he] fail[ed] to do so ..." or "a ... custom or policy [that] result[ed]

in deliberate indifference to constitutional rights, or ... facts [that] support an inference that [Thomas] directed the [facility's staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted).  A thorough review of the pleadings and evidentiary materials submitted in this case demonstrates that Radford has failed to meet this burden.

The record before the court contains no evidence to support an inference that Thomas directed correctional officials to act unlawfully or knew that they would act unlawfully and failed to stop such action.  In addition, Radford has presented no evidence of obvious, flagrant or rampant abuse of continuing duration in the face of which Thomas failed to take corrective action.  Finally, it is clear that the challenged actions/conditions did not occur pursuant to a policy enacted by Thomas.  Thus, the requisite causal connection does not exist between the actions of correctional officials at Bullock and defendant Thomas and liability under the custom or policy standard is therefore not warranted.  Based on the foregoing, summary judgment is therefore due to be granted in favor of defendant Thomas.[4]

### D.  Lack of Standing - Claims Alleged on Behalf of Other Inmates

Standing is a cornerstone of American jurisprudence on which jurisdiction lies.

---

[4]Even had Radford established a basis for liability against defendant Thomas for the actions of other correctional officials and medical personnel, he is due no relief from this defendant as no violation of his constitutional rights occurred.  *Infra* at 16-79.

"[A] litigant may only assert his own constitutional rights or immunities." *McGowan v. Maryland*, 366 U.S. 420, 429 (1961), citing *United States v. Raines*, 362 U.S. 17, 22 (1960); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 218-219 (1974) (plaintiff must assert a legally cognizable injury in fact before federal courts have jurisdiction). "The essence of a standing question is whether the plaintiff has alleged 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions[.]' *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703 7 L.Ed.2d 663 (1962)." *Saladin v. City of Milledgeville*, 812 F.2d 687, 690 (11th Cir. 1987); *Harris v. McRae*, 448 U.S. 297, 320 (1981) (same).

Standing involves two aspects.  The first is the minimum "case or controversy" constitutional requirement of Article III.  *Saladin*, 812 F.2d at 690.  "To satisfy this 'irreducible' constitutional minimum required for standing, a litigant must show 1) that he personally has suffered an actual or prospective injury as a result of the putatively illegal conduct; 2) that the injury can be fairly traced to the challenged conduct; and 3) that the injury is likely to be redressed through court action." *Saladin*, 812 F.2d at 690, citing *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472 (1982); *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  If any element is lacking, a plaintiff's claim is not viable.  In addition, the Supreme Court has established

several requirements based on prudential considerations. *Saladin*, 812 F.2d at 690 (internal citations omitted) ("The Supreme Court has also stated that, in addition to these essential constitutional requirements, a court should consider the case in light of three principles which might counsel judicial constraint, referred to as 'prudential' considerations.... Those considerations are 1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue; 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and 3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties").

To the extent Radford presents claims on behalf of other inmates, he lacks standing to assert the constitutional rights of other persons. *Saladin*, *supra*.; *Allen v. Wright*, 468 U.S. 737, 751 (1984). The prudential limitation applicable in this case is that a litigant may not assert the legal rights or interests of another person. With respect to the claims arising from alleged violations of other inmates' constitutional rights, Radford is not "asserting [his] ... own legal rights and interests [but] rather ... the legal rights and interests of third parties." *Saladin*, 812 F.2d at 690. These claims therefore entitle Radford to no relief and summary judgment on such claims is due to be granted in favor of the defendants.

### E.  Access to Courts

Radford asserts that on September 1, 2011, defendant Mason "acting in retaliation

16

did force him to mail home 'active' legal papers, and documents" relevant to *Radford v. Correctional Medical Services, et al.*, Civil Action No. 2:10-CV-193-TFM (M.D. Ala. 2013). *Amended Complaint - Doc. No. 23* at 11. Radford alleges that the confiscation of these materials prevented him from filing an appeal or other post-judgment action upon the dismissal of his 2010 case by this court on March 18, 2013. *Id.*

Defendant Mason denies the allegations set forth by Radford and asserts that during a routine search of Radford's cell in the latter part of August 2011, defendant Oree located an excess amount of paperwork, including legal materials, and confiscated these documents. On August 29, 2011, upon being advised of the situation, defendant Mason permitted Radford the opportunity to review the confiscated documents and separate legal materials relevant to pending cases from his other documents. *Correctional Defendants' Exhibit E (Inmate Property Sheet) - Doc. No. 72-3* at 8. After Radford identified his pending case materials, i.e., materials related to *Radford v. Correctional Medical Services, et al.*, Civil Action No. 2:10-CV-193-TFM (M.D. Ala. 2013) and *Radford v. Mitchem, et al.*, Civil Action No. 2:09-CV-2426-KOB-JEO (N.D. Ala. 2011)/*Radford v. Mitchem, et al.*, Civil Action No. 09-Cv–899-ID-TFM (M.D. Ala.) (case in Middle District prior to transfer to Northern District of Alabama for disposition), these materials were sealed in two separate large envelopes and held in defendant Mason's office until she could verify that the materials related to pending legal actions. *Id.* Defendant Mason verified that these

materials related to pending cases and maintains she returned the documents to Radford on September 1, 2011.  *Id.*  As previously referenced, Radford asserts that he received only one envelope of materials.  *Amended Complaint - Doc. No. 23* at 11.

The law directs that incarcerated persons are entitled to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts."  *Bounds v. Smith*, 430 U.S. 817, 825 (1977).  In *Lewis v. Casey*, 518 U.S. 343 (1996), the Supreme Court clarified and limited the right to assistance recognized in *Bounds*.  Specifically, the Court held that "an inmate alleging a violation of *Bounds* must show actual injury" arising from the alleged inadequacies in the law library, legal assistance program or access provided by officials.  *Lewis*, 518 U.S. at 349.  In identifying the particular right protected by *Bounds*, the Court explained that "*Bounds* established no ... right [to a law library or to legal assistance].  The right that *Bounds* acknowledged was the (already well-established) right of ***access to the courts****....  [P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'"  *Id*. at 350-351 (emphasis in original) (citations omitted).  The Court further opined *Bounds* did not require "that the State ... enable the prisoner to ***discover grievances***, and to ***litigate effectively*** once in court....  To demand the conferral of such sophisticated legal capabilities upon a mostly uneducated and indeed

18

largely illiterate prison population is [not something] ... the Constitution requires." *Id*. at 354 (emphasis in original).

The Court similarly determined that the mere claim of a systemic defect, without a showing of actual injury, did not present a claim sufficient to confer standing. *Id*. at 349. Moreover, *Lewis* emphasized that a *Bounds* violation is related to the lack of an inmate's capability to present claims. 518 U.S. at 356. "*Bounds* ... ***guarantees no particular methodology but rather the conferral of a capability -- the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts***. When any inmate ... shows that an actionable claim of this nature which he desired to bring has been lost or rejected, or that the presentation of such a claim is currently being prevented, because this capability of filing suit has not been provided, he demonstrates" the requisite actual injury. *Lewis*, 518 U.S. at 356 (emphasis added). Finally, the Court discerned that the injury requirement is satisfied only when an inmate has been denied "***a reasonably adequate opportunity to file nonfrivolous legal claims*** challenging [his] convictions or conditions of confinement.... [I]t is that capability ... that is the touchstone." *Id*. at 356-357 (emphasis added). "[T]he Constitution does not require that prisoners ... be able to conduct generalized research, but only that they be able to present their grievances to the courts - a more limited capability that can be produced by a much more limited degree of legal assistance." *Id*. at 360. The Court admonished that federal courts should

allow prison officials to determine the best method of ensuring that inmates are provided a reasonably adequate opportunity to present their nonfrivolous claims of constitutional violations to the courts.  *Id.* at 356.  A federal district court must "'scrupulously respect[] the limits on [its] role,' by 'not ... thrust[ing] itself into prison administration' and instead permitting '[p]rison administrators [to] exercis[e] wide discretion within the bounds of constitutional requirements.' [*Bounds*, 430] U.S. at 832-833, 97 S.Ct. at 1500." *Id.* at 363.

Throughout the proceedings in this case, Radford demonstrates he is both proficient and prolific at presenting and arguing the claims of his choice to the court of his choosing. Although Radford alleges that defendant Mason failed to return legal materials to him thereby denying him the ability to appeal or otherwise challenge the opinion issued by this court in *Radford v. Correctional Medical Services, et al.*, Civil Action No. 2:10-CV-193-TFM (M.D. Ala. March 18, 2013), it is clear that at the time of entry of this opinion, Radford had access to this court and could have sought relief regarding its judgment but, instead, filed nothing in that case.  Specifically, during the time relevant to issuance of the judgment and potential post-judgment review, Radford initiated this cause of action and clearly, despite the capability to do so, filed nothing in response to this court's dismissal of the prior case.[5]  The court therefore concludes that even assuming Radford lacked access to his legal materials this fact, standing alone, did not prevent him from challenging the

---

[5]The court received the initial complaint in this case on March 27, 2013.

opinion issued by this court. *Radford v. Correctional Medical Services, et al.*, Civil Action No. 2:10-CV-193-TFM (M.D. Ala. March 18, 2013). Moreover, in the 2010 case, this court determined that Radford's claim alleging a denial of adequate medical treatment for diabetes entitled him to no relief because the record was devoid of evidence that Radford actually suffered from diabetes. *Id. - Memorandum Opinion and Order - Doc. No. 46* at 10-14 (extensive tests conducted on Radford showed no presence of diabetes). Radford concedes knowledge of the dismissal of his case. Nothing in the record before this court indicates that the challenged lack of access to materials improperly impeded or adversely affected Radford's efforts to pursue nonfrivolous legal claims. Radford has utterly and completely failed to come forward with any evidence that the actions about which he complains deprived him of the ***capability of pursuing meritorious claims*** in this or any other court. Hence, Radford fails to establish that he suffered the requisite injury, *Lewis*, 518 U.S. at 356, and the defendants against whom relief is sought for an alleged denial of access to the courts are therefore entitled to summary judgment. *Barbour v. Haley*, 471 F.3d 1222, 1225 (11th Cir. 2006) (Inmate's access to courts claim failed because plaintiff did not show any actual injury. The actual injury element requires that "the plaintiff must identify within his complaint, a nonfrivolus, arguable underlying claim."); *Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991) (An inmate is entitled to no relief on an access to courts claim in "the absence of any indications of ultimate prejudice or disadvantage.").

## F. Retaliation

Radford alleges that defendant Mason "acting in retaliation" forced him to mail home legal materials in a pending legal action. *Amended Complaint - Doc. No. 23* at 11. Defendant Mason asserts that she did not require that Radford mail home documents related to his pending civil cases but, instead, approved his retention of this materials. *Correctional Defendants' Exhibit E (Aff. of Rene' Mason and Inmate Inventory Sheet) - Doc. No. 72-3* at 1-2, 8. The inmate property sheet signed by Radford establishes that the documents Mason required him to mail home contained no materials related to his pending civil cases. *Id.* at 7. Moreover, Mason adamantly denies that she took any action against Radford in retaliation for his exercising a constitutionally protected right. Specifically, Mason maintains that the only action taken against Radford occurred in accordance with institutional rules and regulations governing an inmate's possession of excessive property. *Id.* at 2.

Federal law recognizes "that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' [*Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807 (1974)]. As the *Martinez* Court acknowledged, 'the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.' *Id.*, at 404-405, 94 S.Ct., at 1807. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources...." *Turner v. Safley*, 482 U.S. 78, 84-85, 107 S.Ct. 2254,

2259 (1987).  Correctional officials are therefore "accorded latitude in the administration of prison affairs[,]" *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081 (1972), which necessarily includes "the [inescapable] withdrawal or limitation of many [inmate] privileges and rights."  *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974) (quotation marks and citation omitted); *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 1877 (1979).

"In the First Amendment context, ... some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'"  *Shaw v. Murphy*, 532 U.S. 223, 229, 121 S.Ct. 1475, 1479 (2001), quoting *Pell*, 417 U.S. at 822, 94 S.Ct. at 2804.  In accordance with this principle, an inmate's rights established under the First Amendment are not protected if allowing such protection is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell*, 417 U.S. at 822, 924 S.Ct. at 2804.  Thus, while inmates retain a constitutional right protected by the First Amendment to freely exercise their right of access to the courts, this right is limited by the fact of incarceration and valid penological objectives such as maintaining institutional security and order.  The law is well settled that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."  *Pell*, 417 U.S. at 823, 94 S.Ct. at 2804; *Bell v. Wolfish,* 441 U.S. at 546, 99 S.Ct. at 1878 ("[M]aintaining

institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."). It is therefore clear that preservation of security and order within a correctional facility is essential to the facility's effective administration and constitutes both a compelling and substantial governmental interest. *Pell*, 417 U.S. at 823, 94 S.Ct. at 2804; *Lawson v. Singletary*, 85 F.3d 502, 512 (11th Cir. 1996); *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996).

"The first amendment prohibits state officials from retaliating against prisoners for exercising their right of free speech. *See, e.g., Wright v. Newsome*, [795 F.2d 964, 968 (11th Cir. 1986)].... The gist of a retaliation claim is that a prisoner is penalized for exercising a right [protected by the First Amendment]." *Thomas v. Evans*, 880 F.2d 1235, 1241-1242 (11th Cir. 1989); *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003). "In prison, of course, first amendment rights are not absolute. *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Legitimate policies and goals of the correction system may justify restrictions limiting prisoners' [First Amendment] rights. 417 U.S. at 821." *Adams v. James*, 784 F.2d 1077, 1081 (11th Cir. 1986). "A prisoner retains those First Amendment rights that are 'not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrective system.' *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (quoting *Jones v. North Carolina Prisoners' Labor*

*Union, Inc.*, 433 U.S. 119, 129, 97 S.Ct. 2532, 53 L.Ed.2d 629 (resist)) (internal quotation marks omitted).... [P]rison authorities have a legitimate penological interest in the consistent enforcement of prison rules and ... disciplining prisoners who attempt to coerce a guard into not enforcing prison rules is reasonably related to that interest." *Hargis v. Foster*, 312 F.3d 404, 409-410 (9th Cir. 2002); *see also Jackson v. Cain*, 864 F.2d 1235, 1248 (5th Cir. 1989). The situation is somewhat complicated when the alleged act of retaliation is undertaken to assure compliance with prison rules as inmates often attempt to "inappropriately insulate themselves from [such] actions by drawing the shield of retaliation around them." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied sub nom Palermo v. Woods*, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996).

It is essential that federal courts "carefully scrutinize retaliation claims" brought by prisoners challenging adverse actions of correctional personnel. *Woods*, 60 F.3d at 1166. "[C]ourts must approach prisoner claims of retaliation with skepticism and particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983). This is [necessary because prisoners'] ... claims of retaliation are ... easily fabricated [and] pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized [by the prisoner] as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239

F.3d 489, 491 (2nd Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).   Merely alleging the ultimate fact of retaliation, however, is insufficient.  *Cain v. Lane*, 857 F.2d 1139, 1142, n.6 (7th Cir. 1988); *Woods*, 60 F.3d at 1166.   Additionally, conclusory allegations are insufficient to demonstrate the existence of each element requisite to establishing retaliation.  *Morales*, 278 F.3d at 131; *Bennett v. Goord*, 343 F.3d 133, 137 (2nd Cir. 2003) (Because prisoner retaliation claims are prone to abuse, "we are careful to require non-conclusory allegations.").

To proceed on a claim for retaliation and withstand the entry of summary judgment, an "inmate must establish ... three elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the [defendant's] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech.  *See Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)."  *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999).   With respect to the causal relationship element, a prisoner must demonstrate that correctional officials intended to retaliate for his exercise of a right protected under the First Amendment and, but for the retaliatory motive, the adverse act complained of would not have occurred.  *Woods*, 60 F.3d at 1166; *Smith*, 532 F.3d at 1278.

Based on a liberal review of the complaint, it appears that Radford alleges defendant Mason retaliated against him for exercising his right of access to the courts, thus satisfying the first element of his retaliation claim. *Smith*, 532 F.3d at 1277.  The second element requires Radford to demonstrate that the challenged adverse action "would likely deter a [prisoner] of ordinary firmness" from filing legal actions. *Id*.  This "presents an objective standard and a factual inquiry." *Id*.  There is nothing before this court which indicates that the challenged action would deter an ordinary inmate from filing lawsuits and, in the experience of this court, the opposite is true as occurred in the instant action.  In addition, the records of this and other courts establish that these actions had no deterring affect on Radford's legal activities.  Furthermore, other than the purely conclusory and self serving allegation presented by Radford, there is no evidence before the court to show that defendant Mason intended to retaliate against him.

### G.  Withholding of Personal Funds

Radford complains that defendants Jones, Mason and Giles intentionally, unlawfully and without authorization restricted his access to funds deposited to his inmate account in violation of his right to due process. *Amended Complaint - Court Doc. No. 23* at 13 (The aforementioned defendants "did withhold, and exercise unlawful control over [funds in] plaintiff's (PMOD) account....  Said defendants ... have all acted in non-compliance" of

27

applicable rules and regulations.).[6]  Radford does not allege that the defendants removed these funds from his account and the undisputed evidentiary materials demonstrate that the funds remained in his account.

The aforementioned claim fails to implicate the due process protection afforded by the Constitution as "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause ... if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 3204 (1984); *Rodriguez-Mora v. Baker*, 792 F.2d 1524, 1527 (11th Cir. 1986) (Inmate's claim that deputy marshal failed to return ring to inmate, whether due to negligence or an intentional act, provided no basis for relief as neither a negligent loss of property nor an unauthorized intentional deprivation of property constitutes a violation of due process. ); *Holloway v. Walker*, 790 F.2d 1170, 1173-1174 (5th Cir. 1986) (finding no breach of federally guaranteed constitutional rights, even where high level state employee intentionally engages in tortious conduct, as long as the state system as a whole provides due process).  The United States District Court for the Northern District of Alabama reached the same result in a previous case filed by Radford challenging

---

[6]"It is essential to [the plaintiff's] complaint that it allege that [the defendants] acted without authorization.  If [the defendants were] acting pursuant to authorization, [their] actions would be within the outer perimeter of [their] duties and would not have violated any clearly established constitutional right and therefore [they] would be immune from suit....  Only if the complaint is construed as alleging that [the defendants were] acting in bad faith outside the scope of [their] duties can it evade the doctrine of official immunity."  *Rodrguez-Mora*, 729 F.2d at 1527 (internal citations omitted).  The court addresses Radford's allegations regarding alleged violations of various administrative rules and regulations later in the Recommendation.  *Infra* at 61-62.

an order issued by correctional officials to "freeze" funds in his inmate account. *Radford v. Mitchem, et al.*, Civil Action No. 2:09-CV-02426-KOB-JEO (N.D. Ala. 2011). This court has routinely and consistently applied the holding of *Hudson* to dismiss due process claims brought by inmates challenging actions of state officials regarding deprivations of their property. *McClellan v. Alabama*, Civil Action No. 2:11-CV-466-ID, 2011 WL 3423940 (M.D. Ala. 2011); *Flournoy v. Culver, et al.*, Civil Action No. 1:10-CV-104-ID, 2010 WL 916577 (M. D. Ala. 2010); *Dunklin v. Riley, et al.*, Civil Action No. 2:06-CV-1063-MEF, 2009 WL 3624706 (M.D. Ala. 2009); *Malone v. Boyd, et al.*, Civil Action No. 2:09-CV-217-TMH, 2009 WL 1064903 (M.D. Ala. 2009); *Carter v. Valeska, et al.*, Civil Action No. 1:08-CV-858-TMH, 2008 WL 5245618 (M.D. Ala. 2008); *Salmon v. Turner*, Civil Action No. 1:08-CV-554-TMH, 2008 WL 3286982 (M.D. Ala. 2008); and *Todd v. Jones, et al.*, Civil Action No. 3:07-CV-1021-WKW, 2007 WL 4510340 (M.D. Ala. 2007).

The State of Alabama, through its Board of Adjustment, provides a meaningful post-deprivation remedy for Radford to seek redress of the defendants' allegedly improper hold on funds in his account. *Ala. Code* § 41-9-60 *et seq.* "Furthermore, the post-deprivation remedies available to the plaintiff under Alabama tort law [are] sufficient to satisfy due process." *Radford v. Mitchem, et al.*, Civil Action No. 2:09-CV-02426-KOB-JEO (N.D. Ala. 2011) - *Magistrate Judge's Report and Recommendation - Doc. No. 24* at 8, adopted as opinion of the court October 24, 2011. Consequently, the withholding of funds did not

violate Radford's constitutional right to due process and summary judgment is due to be granted in favor of the defendants on this claim.

### H.  Invasion of Privacy

Radford alleges that defendants Carrie Sparks and Mary Stubbs, clerical staff at Bullock, have violated his privacy rights by viewing him on a "hidden surveillance monitor while he showers, and goes to the bathroom." *Amended Complaint - Doc. No. 23* at 20. Radford further asserts that these defendants "spend countless hours monitoring plaintiff's current legal papers - and report back to defendants [Giles, Mason and Jones], as to their involvement in plaintiff's litigation." *Id.*

Initially, the court notes that the these claims are based on purely speculative allegations which are unsupported by any probative evidence.  In addition, the defendants have submitted undisputed evidence that "[t]here are no cameras or 'hidden surveillance monitors' in the inmate shower [or restroom] areas[,]" *Correctional Defendants' Exhibit E (Aff. of Rene' Mason) - Doc. No. 72-3* at 4, and defendants Sparks and Stubbs never utilized any hidden video system to monitor Radford in a state of undress or view his legal materials. *Correctional Defendants' Exhibit P (Aff. of Carrie Sparks) - Doc. No. 72-14* at 1; *Defendant Stubbs' Exhibit T (Aff. of Cynthia Stubbs) - Doc. No. 89-1* at 1.

In his responses, Radford fails to present any evidence regarding the presence of a hidden video monitoring system at Bullock.  Moreover, the only evidence before the court

30

which would be admissible at trial establishes that no such system existed at Bullock during the time made the basis of the complaint and also demonstrates that defendants Sparks and Stubbs did not infringe on any right of privacy afforded Radford.  Under the circumstances of this case, the court finds that the defendants are entitled to summary judgment on the invasion of privacy claim.[7]

## I. Disciplinary for Possession of Contraband - Lack of Due Process

Radford contends that defendants Ruffin, Bennett, Whitley and Penn deprived him of due process during the disciplinary hearing held on April 15, 2012 regarding a charge for possession of contraband.  *Amended Complaint - Doc. No. 23* at 26.  In support of this claim, Radford alleges that defendant Whitley, the hearing officer, failed to "dismiss everyone from the hearing room while considering the evidence" as required by the administrative regulation governing disciplinaries."  *Id*.  The defendants deny depriving

---

[7]In her response to the complaint, defendant Stubbs advises that during her time as a mail room clerk she "was responsible for opening and searching inmate mail for contraband" and "when contraband was found" reported this to the warden.  *Defendant Stubbs' Exhibit T (Aff. of Cynthia Stubbs) - Doc. No. 89-1* at 1.  Stubbs also states that she did not monitor or read any mail but merely "logged" the incoming legal mail "on the legal folder" and checked the outgoing mail for proper postage.  *Id*.  Based on this portion of defendant Stubbs' affidavit, Radford devotes his entire response to her report seeking federal prosecution of Stubbs under 18 U.S.C. § 1701 and § 1702 for opening inmate mail prior to delivery to the addressee.  *Plaintiff's Response to Stubbs' Report - Doc. No. 298* at 1.  This request provides no basis for relief as a "private citizen lacks a judicially cognizable interest in the prosecution or non-prosecution of another." *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973); *Nelson v. Skehan*, 386 F.App'x 783, 786 (10th Cir. 2010) (plaintiff has no constitutional right to have defendants prosecuted); *Leeke v. Timmerman*, 454 U.S. 83 (1981).  Moreover, there is no private right of action under federal criminal statutes.  *Rockefeller v. United States Court of Appeals Office for Tenth Circuit Judges*, 248 F.Supp.2d 17, 23 (D.D.C 2003); *Risley v. Hawk*, 918 F.Supp. 18, 21 (D.D.C. 1996), *aff'd*, 108 F.3d 1396 (D.C. Cir. 1997); *Dugar v. Coughlin*, 613 F.Supp. 849, 852 n.1 (S.D. N.Y. 1985); *Powers v. Karen*, 768 F.Supp. 46, 51 (E.D.N.Y. 1991), *aff'd*, 963 F.2d 1552 (2nd Cir. 1992); *Dugar v. Coughlin*, 613 F.Supp. 849, 852 n.1 (S.D.N.Y. 1985); *Gipson v. Callahan*, 18 F.Supp.2d 662, 668 (W.D.Tex 1997).  The same is true for any claim presented by Radford regarding an alleged crime of identity theft committed by an unknown individual in 2010.

Radford of due process during the disciplinary hearing.

On April 10, 2012, defendant Penn conducted a routine shakedown of Radford's cell during which he confiscated several items of contraband from Radford's locker box. *Plaintiff's Exhibit B - Doc. No. 23-1* at 2.  Based on the foregoing, Radford was charged with a violation of Rule #64, possession of contraband.  *Id*.  Defendant Ruffin timely served Radford with notice of the disciplinary charge and the scheduled date for the disciplinary hearing related to this charge.  *Id*.  Radford signed for receipt of the disciplinary and acknowledged that he did not wish to call any witnesses.  *Id*.  Upon completion of the noticed disciplinary hearing, during which Radford had an opportunity to present evidence, provide testimony and question the arresting officer, defendant Whitley found Radford guilty of the charged offense. *Id*. at 4.  The sanctions approved for this disciplinary infraction consisted of the loss of store, visitation and phone privileges for thirty days and  placement in segregation for this same amount of time.  *Id*.

The Supreme Court has identified two circumstances in which a prisoner, an individual already deprived of his liberty in the ordinary sense, can be further deprived of his liberty such that due process is required.  "The first is when a change in a prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court. *See Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995); *see, e.g., Vitek v. Jones,* 445 U.S. 480, 492-93, 100 S.Ct. 1254, 1263-64, 63

L.Ed.2d 552 (1980) (holding that a prisoner is entitled to due process prior to being transferred to a mental hospital).  The second is when the state has consistently given a certain benefit to prisoners (for instance, via statute or administrative policy), and the deprivation of that benefit 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'  *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300; *see, e.g., Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974) (prisoners may not be deprived of statutory 'good-time credits' without due process); *cf. Dudley v. Stewart,* 724 F.2d 1493, 1497-98 (11th Cir.1984) (explaining how the state creates liberty interests).  In the first situation, the liberty interest exists apart from the state; in the second situation, the liberty interest is created by the state." *Bass v. Perrin*, 170 F.3d 1312, 1318 (11th Cir. 1999).

The Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement.  *Sandin*, 515 U.S. at 485-486 (disciplinary confinement of inmate in segregation does not implicate a constitutionally protected liberty interest); *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005) ("The punishments [inmate] suffered because of his disciplinary conviction (demotion in status, segregation, and transfer) raise no due process concerns."); *see also Meachum v. Fano,* 427 U.S. 215, 225 (1976) (No liberty interest arising from Due Process Clause itself in transfer from low-to maximum-security prison because "[c]onfinement in any of the State's institutions is within

33

the normal limits or range of custody which the conviction has authorized the State to impose."). Moreover, an inmate in the Alabama prison system has no constitutionally protected interest in the privileges bestowed upon him or confinement in the least restrictive prison environment because the resulting restraints are not so severe that they exceed the sentence imposed upon him. *Sandin*, 515 U.S. at 485 ("Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law."). In addition, a temporary denial of privileges does not impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Thus, the deprivations imposed upon Radford based on the challenged disciplinary did not "exceed the sentence [imposed by the trial court] in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force." *Id*. This court must therefore determine whether the actions about which Radford complains involve the deprivation of a state-created liberty interest as defined by the standard set forth in *Sandin*.

As the Supreme Court opined,

> *Sandin* involved prisoners' claims to procedural due process protection before placement in segregated confinement for 30 days, imposed as discipline for disruptive behavior. *Sandin* observed that some of our earlier cases, *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), in particular, had employed a methodology for identifying state-created liberty interests that emphasized "the language of a particular [prison] regulation" instead of "the nature of the deprivation." *Sandin,* 515 U.S., at 481, 115 S.Ct. 2293. In *Sandin,* we criticized this methodology as

creating a disincentive for States to promulgate procedures for prison management, and as involving the federal courts in the day-to-day management of prisons. *Id.,* at 482-483, 115 S.Ct. 2293. For these reasons, we abrogated the methodology of parsing the language of particular regulations.

"[T]he search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established in and applied in *Wolff* and *Meachum.* Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will generally be limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.,* at 483-484, 115 S.Ct. 2293 (citations and footnote omitted).

After *Sandin,* it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves "in relation to the ordinary incidents of prison life." *Id.,* at 484, 115 S.Ct. 2293.

*Wilkinson v. Austin*, 545 U.S. 209, 222-223, 125 S.Ct. 2384, 2393-2394 (2005).

Applying the *Sandin* inquiry, the court concludes that the temporary loss of privileges and short-term confinement in segregation "though concededly punitive, do[] not represent a dramatic departure from the basic conditions" of the sentence imposed upon the plaintiff. *Id*. at 485. In light of the foregoing, it is clear that the aforementioned sanctions fail to "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. Radford's due process claim therefore fails under the law as established in *Sandin*.

## J.  Conditions

Radford alleges violations of his constitutional rights with respect to (i) the laundering of clothing and linens, (ii) provision of a single laundry bag, (iii) the sufficiency of toiletry items provided to him, (iv) unsanitary food preparations, services and facilities, (v) conditions in the restroom and shower area, (vi) lack of access to restroom facilities and drinking water while on morning yard call, (vii) denial of paper bags and sacks in which to place items purchased from the canteen, and (viii) denial of paper plates for use in the microwave.  The  defendants deny that the conditions made the basis of the instant complaint rise to the level of constitutional violations.

Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain.  *Id*. at 346. Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement."  *Id*. at 348 (citation omitted).  Prison conditions which may be "restrictive and even harsh, [ ] are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment.  *Id*.  Conditions, however, may not be "barbarous" nor may they contravene

society's "evolving standards of decency." *Id.* at 345-346. "'[T]he Constitution does not mandate comfortable prisons.' *Id.* at 349, 101 S.Ct. at 2400. If prison conditions are merely 'restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.' *Id.* at 347, 101 S.Ct. at 2399. Generally speaking, prison conditions rise to the level of an Eighth Amendment violation only when they 'involve the wanton and unnecessary infliction of pain.' *Id.*" *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). Although the Constitution "does not mandate comfortable prisons ... neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes*, 452 U.S. at 349). Thus, it is well-settled that the conditions under which a prisoner is confined are subject to constitutional scrutiny. *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-527 (1984)); *Helling,* 509 U.S. at 31-32. For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to [the inmate's] future health." *Chandler v. Crosby*, 379 F.3d 1278, 1289-1290 (11th Cir. 2004). To demonstrate an Eighth Amendment violation regarding conditions of

confinement, a prisoner must satisfy both an objective and a subjective inquiry.  *Farmer*, 511 U.S. at 834.  In *Farmer*, the Court identified the objective and subjective elements necessary to establish an Eighth Amendment violation.  With respect to the requisite objective elements,  an inmate must first show "an objectively substantial risk of serious harm ... exist[ed].  Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner."  *Marsh*, 268 F.3d 1028-1029.   As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference....  The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'  ...  *[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment*."  *Farmer*, 511 U.S. at 837-838 (emphasis added); *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).  The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety....  It is *obduracy and wantonness, not inadvertence or error in good faith*, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in

connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (emphasis added).

The living conditions within a correctional facility will constitute cruel and unusual punishment when the conditions involve or result in "wanton and unnecessary infliction of pain, [or] ... [are] grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes*, 452 U.S. at 347. "Conditions ... alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency.... But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id*. at 347. To determine whether conditions of confinement constitute cruel and unusual punishment, the court must look to the effect the condition has upon the inmate. *Id*. at 366. In a case involving conditions of confinement generally or several different conditions, the court should consider whether the claims together amount to conditions which fall below constitutional standards. *Hamm v. De Kalb County*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied Hamm v. De Kalb County*, 475 U.S. 1096, 106 S.Ct. 1492, 89 L. Ed. 2d 894 (1986); *see also Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991). The court's consideration of whether the totality of a plaintiff's claims amount to conditions which fall below applicable constitutional standards is limited by the Supreme

Court's admonishment that "*[s]ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need.... To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter*, 501 U.S. 294, 304-305 (1991) (emphasis in original).

A prison official may likewise be held liable under the Eighth Amendment for acting with "'deliberate indifference'" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1970, 1974 (1994).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991).... Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists - and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).   A defendant's subjective

knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference....   Each individual Defendant must be judged separately and on the basis of what that person [knew at the time of the incident]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotation marks omitted).  Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id.*

(i)  <u>Laundry and Food Services</u>.  Radford complains that defendant Ellison acted with deliberate indifference to his health and safety when she failed "to adequately wash, and clean plaintiff's personal clothing items with bleach, and other cleaning agents [in appropriate temperatures and did not] repair inadequate broken washing machines; And failing to separately wash, sanitize, or destroy all contaminated clothing items belonging to other inmates infected with scabies - prior to reissuing those clothing items." *Amended Complaint - Doc. No. 23* at 17.  Radford asserts that these actions placed him at risk of contracting scabies.  *Id.*[8]

In response to these allegations, defendant Ellison maintains that:

---

[8]The medical records do not indicate that Radford was diagnosed with scabies while at Bullock.

41

> Inmate Thomas Radford ... claims in his lawsuit that I caused a major
> outbreak of scabies due to gross and unsanitary practices in the laundry
> operations and that I failed to adequately wash and clean Inmate Radford's
> laundry with bleach and cleaning agents. This is not true.  Bullock
> Correctional Facilities' Laundry is equipped with industrial commercial
> washers and dryers. All the inmates' clothing and bed linens are washed with
> high efficiency, industrial green friendly liquid detergent, liquid bleach and
> liquid sour.  All washing machines are equipped with an ozone dispenser;
> which allows the chemicals to be dispensed into the machine during each
> cycle.  Additionally, all washing machines are working and were working at
> the  time we had four inmates diagnosed with scabies.
>
> Inmate Radford claims that we failed to sanitize or destroy
> contaminated clothing belonging to inmates infected with scabies which
> placed Inmate Radford at a risk of getting scabies. I was not directed by
> medical staff to destroy the clothes of the four inmates that had scabies and
> we were never under quarantine for an "outbreak of scabies." Each inmate's
> clothes and bed linens were washed, dried and returned to the inmate.

*Defendants' Exhibit J (Aff. of Telease Ellison) - Doc. No. 72-8* at 1-2.  Defendant Mason

further states that "[t]he laundry has not caused a major outbreak in scabies and there is no

medical documentation to show Inmate Radford contracted scabies at this facility or that

he has ever had scabies while incarcerated at Bullock Correctional Facility.  There were

four confirmed cases of scabies at Bullock Correctional Facility and [non-infected] inmates

were given [a cream by medical personnel] as a precautionary measure should they have

any exposure to the infected inmates."  *Defendants' Exhibit E (Aff. of Rene' Mason) - Doc.

No. 72-3* at 4.

Radford also challenges the constitutionality of food preparation/service and the

conditions of the kitchen and dining room at Bullock.  In support of these allegations,

Radford asserts that defendant Miles allowed other inmates to work in the kitchen without hairnets or gloves, wearing long facial hair, absent medical clearance and without proper supervision. *Amended Complaint - Doc. No. 23* at 23-24.  He further complains that homosexuals were assigned to the kitchen, the dishwasher did not properly sanitize food trays, dining tables had metal tops and the floors in the kitchen/dining hall were not properly cleaned. *Id*. at 23.

Defendant Miles addresses these claims as follows:

> The kitchen, dining room, dish room, and food preparation at Bullock Correctional Facility are regulated under strict policies and regulations governed by the Alabama Department of Corrections Office of Health Services and the Alabama Department of Public Health.  All health codes are in compliance at this facility.  We have received the following health scores during yearly inspections by the Alabama Department of Public Health; February 2013: Score - 96, January 2012: Score - 94, March 2011: Score -90, and March 2012: Score - 94....
>
> Inmate Radford claims in his lawsuit claims in his lawsuit that his health (past, present and future) are risk due to the food trays not be sanitized.  This is not true.  All inmate food trays are sanitized under heat; the trays are washed at a temperature of 150 degrees F [Fahrenheit] and are rinsed at a temperature of 180 degrees F [Fahrenheit].  All temperatures are recorded daily.
>
> Inmate Radford claims in his lawsuit that the kitchen workers are not medically screened and cleared by a doctor to work in the kitchen. This is not true. All inmates assigned to work in the kitchen are screened by a Corizon Medical Service registered nurse and cleared by their physician.  No inmates with hepatitis, open wounds, diarrhea and vomiting, and/or staph infections are allowed to work in the kitchen per medical staff.  I have no known proof if an inmate is or is not a homosexual.  There are no restrictions on an inmate working in the kitchen based on his sexual preference.  Additionally, all inmates wear appropriate kitchen attire when working in the kitchen; hats, gloves and aprons.

Inmate Radford's claims that he is subjected to eating food from unclean trays that are washed in a rat infested dishwasher are false. All trays are pre-soaked to remove any food particles and the trays are washed and rinsed under sanitary guidelines; water is not left in the trays as he alleges.

Inmate Radford is not exposed to aggregate concrete floors in the dining room as he alleges. The floors in the dining room meet all health and safety requirements. The floors are not filthy as he alleges and are pressure washed two (2) times a week or as needed. The floors are not contaminated/infested by roaches and mice. A pest control/exterminator, under contract with the Alabama Department of Corrections, inspects and treats the facility monthly. Any problems noted or addressed are handled promptly with his services and under his guidelines. Additionally, [the exterminator] is available to address any problem on an as needed basis.

The tables in the dining area are approved by health and safety requirements.

Inmate Radford's claim that the inmate workers in the kitchen are not supervised and he is being subjected to on-going health and safety hazard is not true. All inmate kitchen staff is under strict supervision of a trained and certified Steward during the preparation and serving of food. Kitchen workers wear clean clothing and their clothes are washed by the laundry daily. Inmates are not allowed to talk on the serving line during meal time. Inmates working the serving line are monitored by the Steward during meal time when the meal is being served.

Steward J. C. Alexander has a medical shaving profile and is dressed in accordance with the Alabama Department of Corrections' *Administrative Regulations 217: Dress Code*.

*Correctional Defendants' Exhibit K (Aff. of Edith Miles) - Doc. No. 72-9 at 1-3.*

Despite his contentions regarding the conditions in the laundry, kitchen and dining room, Radford has failed to establish that these conditions denied him the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. *Wilson*, 501 U.S. at 298-299; *Rhodes*, 452 U.S. at 347. Furthermore, Radford has failed to demonstrate any deliberate indifference or reckless disregard by the named

44

defendants with respect to his health or safety.  Specifically, Radford has failed to identify any particular incident or condition occurring in the kitchen from which the defendants could infer that a substantial risk of serious harm existed to him.  Consequently, summary judgment is due to be granted in favor of the correctional defendants on these claims.  *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *see also Carter*, 352 F.3d at 1349-1350.

(ii) <u>Conditions of Showers/Restroom Facilities, Lack of Access to Restroom and Water During Morning Yard Call, and Limited Toiletries</u>.  Radford asserts that the close proximity of showers to toilets coupled with the lack of shower curtains caused him to have water or urine splash on or near him while he used the toilet.  Radford alleges that this created an unsafe and inhumane condition.  Defendant Jones advised that he ordered the shower curtains  removed because they "were in a state of disrepair, and ... blocked the view of security staff."  *Kenneth Jones' Response to Interrogatories - Doc. No. 191* at 1. Radford further complains that for approximately two hours each day while outdoors during mandatory morning yard call he is locked out of his dorm with no access to a restroom or drinking water.  The defendants deny this claim and maintain that during morning yard call inmates may "go to the exercise yard and/or the Gymnasium....  During this time inmates are allowed to use the bathroom in the gym, when necessary.  A water fountain is available in the gym for drinking water."  *Correctional Defendants'  Exhibit C*

*(Aff. of J. C. Giles) - Doc. No. 72-1* at 2-3; *Correctional Defendants' Exhibit D (Aff. of Sandra Giles) - Doc. No. 72-2* at 4 (While on the yard "inmates are allowed to use the bathroom in the gym....  A water fountain is available in the gym for drinking water. Dormitory 1 is also made available when necessary.").  Finally, Radford asserts that defendant Ellison provided him with basic toiletries such as soap, toothpaste, toilet paper, shaving powder and shaving cream on a bi-weekly or monthly basis when he should have been supplied these items every week to maintain proper hygiene.  *Amended Complaint - Doc. No. 23* at 17-18.

In addressing these claims, defendant Ellison advises that all inmates at Bullock receive one roll of toilet paper each week, a bar of soap every two weeks, and toothpaste, a toothbrush, shaving cream and shaving powder the first Friday of each month. *Correctional Defendants' Exhibit J (Aff. of Telease Ellison) - Doc. No. 72-8* at 2.  Indigent inmates may obtain additional hygiene items free of cost from the Chaplain, *id.*, whereas inmates with funds in their accounts may purchase such items from the canteen at any time. *Kenneth Jones' Response to Interrogatories - Doc. No. 191* at 1.  The defendants also assert that the items provided to inmates are adequate for them to maintain proper hygiene. *Id*.

The Constitution does not mandate that prisons be comfortable, *Rhodes*, 452 U.S. at 349, and "a prisoner's mere discomfort, without more, does not offend the Eighth

Amendment." *Chandler v. Crosby*, 379 F.3d 1278, 1296 (11th Cir. 2004).   Although Radford presents allegations regarding the condition of the restroom/shower area at Bullock, the lack of access to a restroom and water while on the yard and a denial of sufficient hygiene items, he does not establish that the above described conditions denied him the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. *Wilson*, 501 U.S. at 298-299; *Rhodes*, 452 U.S. at 347.   In addition, Radford fails to demonstrate deliberate indifference or reckless disregard by the named defendants with respect to his health or safety.   Specifically, he does not identify any particular condition of which the defendants were aware from which an inference could be drawn that a substantial risk of serious harm existed.   The record is also devoid of any evidence showing that the defendants drew the requisite inference.   Consequently, summary judgment is due to be granted in favor of the defendants on the plaintiff's claims attacking the shower area, yard call and hygiene supplies.   *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *see also Carter*, 352 F.3d at 1349-1350.

(iii)   Denial of Paper Bags for Canteen Purchases, Lack of Paper Plates for Microwave Use and Provision of One Laundry Bag/Locker Box for Clothes Storage.   None of the aforementioned challenges present a severe or extreme condition that posed an unreasonable risk of serious damage to Radford's health or safety, and Radford has not alleged that he suffered requisite harm as a result of not having paper bags in which to

place his canteen purchases, paper plates to heat items in the microwave or an extra laundry bag to store his clean clothes. *See Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (holding that a prisoner must prove that the prison condition he complains of is sufficiently serious and "extreme" to violate the Eighth Amendment). Accordingly, the court concludes that these alleged conditions do not rise to the level of an Eighth Amendment violation. *Alfred v. Bryant*, 378 F.App'x 977, 980 (11th Cir. 2010) ("'Inmates cannot expect the amenities, conveniences and services of a good hotel.'" (quoting *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988)); *Chandler v. Crosby*, 379 F.3d 1278, 1296 (11th Cir. 2004) (The Constitution does not mandate that prisons be comfortable, *Rhodes*, 452 U.S. at 349, and "a prisoner's mere discomfort, without more, does not offend the Eighth Amendment.").

With respect to Radford's claim that the defendants violated his right to Equal Protection because inmates at other facilities are allowed to have paper sacks and plates, he is likewise entitled to no relief. "Despite the tendency of all rights 'to declare themselves absolute to their logical extreme,' there are obviously limits beyond which the equal protection analysis may not be pressed.... The Fourteenth Amendment 'does not require absolute equality or precisely equal advantages,'... nor does it require the State to 'equalize [prison] conditions.'" *Ross v. Moffitt*, 417 U.S. 600, 611-612 (1974); *Hammond v. Auburn University*, 669 F.Supp. 1555, 1563 (M.D. Ala. 1987) ("The Equal Protection

48

Clause of the Fourteenth Amendment does not require all persons to be treated either identically or equally.").  In order to establish a claim cognizable under the Equal Protection Clause, "a prisoner must [at a minimum] demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis.  *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001); *Damiano v. Florida Parole and Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986)."  *Sweet v. Secretary, Department of Corrections*, 467 F.3d 1311, 1318-1319 (11th Cir. 2006).  "[O]fficial action will not be held unconstitutional solely because it results in a ... disproportionate impact....  Proof of ... discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-265 (1977). "'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences.  It implies that the decision maker ... selected ... a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991). Evidence which merely indicates disparity of treatment or even arbitrary administration of state powers, rather than instances of purposeful or invidious discrimination, is insufficient

to show discriminatory intent. *McKleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

At this stage of the proceedings, Radford bears the burden of producing evidence which would be admissible at trial sufficient to show that the defendants provided more favorable treatment to other similarly situated individuals and acted in this manner due to intentional discrimination. *Celotex*, 477 U.S. at 322-324; *Anderson*, 477 U.S. at 249 (to preclude summary judgment, plaintiff must present significant probative evidence showing defendant provided more favorable treatment to similarly situated persons and did so as the result of intentional discrimination); *E & T Realty Company v. Strickland*, 830 F.2d 1107, 1114 (11th Cir. 1987), *cert. denied*, 485 U.S. 961 (1988) (Intentional discrimination on the part of the defendant in providing the challenged disparate treatment is required. "Mere error or mistake in judgment" or "[e]ven arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause."). The plaintiff cannot rest on conclusory allegations of a constitutional violation to defeat summary judgment nor is "[t]he mere existence of a scintilla of evidence in support of [his] position" sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252.

Radford does not allege that the defendant subjected him to adverse treatment based on some constitutionally impermissible reason; instead, he simply makes the conclusory assertion that seemingly differential treatment of inmates resulted in an equal protection

50

violation.   The mere differential treatment referenced by Radford does not implicate a

violation of the Equal Protection Clause.  *Sweet*, 467 F.3d at 1319;  *E & T Realty*, 830 F.2d

at 1114-1115; *Horner v. Kentucky High School Athletic Association*, 43 F.3d 265, 276 (6th

Cir. 1994).  The equal protection claim presented by Radford regarding the denial of paper

sacks and plates to inmates at Bullock while allowing inmates at other facilities to have

these items provides no basis for relief

> because [Radford] has not alleged ... that he was treated differently on
> account of some form of ***invidious discrimination*** tied to a constitutionally
> protected interest.  He has not even claimed that he was treated differently
> from others because of race, religion, or national origin [and actually
> concedes the defendants proceeded against all inmates in the same manner].
> *See Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944)
> ("The unlawful administration ... of a state statute fair on its face, resulting
> in its unequal application to those who are entitled to be treated alike, is not
> a denial of equal protection unless there is shown to be present in it an
> element of intentional or purposeful discrimination.");  *McQueary v.
> Blodgett,* 924 F.2d 829, 835 (9th Cir.1991) (rejecting a claim that a state
> prisoner's equal protection rights were violated because he received a longer
> sentence than some other prisoners and holding that "a mere demonstration
> of inequality is not enough; the Constitution does not require ***identical***
> treatment.  There must be an allegation of invidiousness or illegitimacy in the
> statutory scheme before a cognizable claim arises:  it is a settled rule that the
> Fourteenth Amendment guarantees equal laws, not equal results." (internal
> quotation marks omitted)); *see also Cruz v. Skelton,* 543 F.2d 86, 92-93 (5th
> Cir.1976) (affirming dismissal of prisoner's equal protection claim because
> there was no allegation of "'invidious discrimination' based on such
> considerations as race, religion, national origin, or poverty").

*Sweet*, 467 F.3d at 1319 (emphasis in original); *McKleskey v. Kemp,* 481 U.S. 279, 292,

107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (neither disparity of treatment nor arbitrary action

is sufficient to show discriminatory intent).  Thus, summary judgment is due be granted in favor of the defendants on Radford's claim alleging a violation of his equal protection rights with respect to the denial of paper sacks and plates.

(iv)  <u>Totality of Conditions</u>.  The court has undertaken a thorough and exhaustive review of the claims presented by Radford, the responses to these claims by the defendants, the probative evidentiary materials submitted by the defendants and the evidentiary materials submitted by Radford in response to the defendants' reports.  After such review, the court finds that the challenged conditions though uncomfortable, inconvenient, unpleasant and/or objectionable were not so extreme as to violate the Eighth Amendment. *Chandler v. Baird*, 926 F.2d at 1289 (11th Cir. 1991).  Specifically, the totality of the claims before this court do not amount to conditions which fall below applicable constitutional standards as Radford failed to demonstrate that the challenged conditions had "a mutually enforcing effect that produce[d] the deprivation of a single, identifiable human need...." *Wilson*, 501 U.S. at 304.  "To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes." *Id*.  In addition, even had Radford demonstrated "an excessive risk to [his] health or safety," correctional officials cannot be held liable "solely because of the presence of objectively inhumane prison conditions." *Farmer*, 511 U.S. at 838.  Radford has presented no specific facts nor produced any evidence indicating that the correctional

defendants subjectively knew of a substantial risk of harm to his health or safety and disregarded this risk so as to establish deliberate indifference. *Id.*; *Carter*, 352 F.3d at 1349 (11th Cir. 2003).

### K.  Deliberate Indifference to Safety

Radford alleges that defendants Scott, Jones, Giles, Mason and Stubbs subjected him to a substantial risk of harm during a major power outage on September 23, 2011. Specifically, Radford complains that when a private helicopter severed power lines causing a power outage at Bullock the emergency generator failed to produce power for the facility. *Amended Complaint - Doc. No. 23* at 31.  "The power outage at Bullock Correctional Facility caused the institution to be in total darkness and without radio or [land line] telephone communication." *Plaintiff's Exhibit C - Doc. No. 23-1* at 5.  During the power outage, inmates created an extremely dangerous situation whereby they "set fires inside the facility, made hand-made torches, and acted in a destructive and threatening manner ... [attempted to] claim[] a hostage[,] ... and ransacked the shift office." *Id*.  In support of his deliberate indifference claim, Radford asserts that the defendants "failed to ensure that [Bullock's] back-up generator would provide the proper safety/protection" at the time of this emergency. *Id*.

In their affidavits, the defendants adamantly deny they acted with either callous disregard or deliberate indifference to Radford's safety at the time of the power outage.

Specifically, the defendants maintain that the emergency generator malfunctioned due to a mechanical issue and they immediately contacted the engineering staff to repair the problem. *Correctional Defendants' Exhibit E (Aff. of Rene' Mason) - Doc. No. 72-3* at 6; *Correctional Defendants' H (Aff. of Timothy Scott) - Doc. No. 72-6* at 1-2. Defendant Scott further states that he undertook his duties to provide security for the facility at the time of the power outage. *Id*. Correctional officials also immediately dispatched the Certified Emergency Response Team to Bullock to quell the disturbance. *Correctional Defendants' Exhibit E (Aff. of Rene' Mason) - Doc. No. 72-3* at 6. In addition, defendant Scott, ignoring threats to his own safety, secured the safety of support staff and medical personnel by escorting them away from the areas of the prison controlled by the inmates. *Plaintiff's Exhibit C - Doc. No. 23-1* at 5.

As previously referenced, correctional officials may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's safety when the official knows that the inmate faces "a substantial risk of serious harm" and with such knowledge disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 828. "A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id*. at 844-845. "It is not, however, every injury suffered by one inmate at the hands of another that

translates into a constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. "Within [a prison's] volatile 'community,' prison administrators are to take all necessary steps to ensure the safety of ... the prison staff[] and administrative personnel.... They are under an obligation to take reasonable measures to guarantee the safety of the inmates" as well. *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984). The Eleventh Circuit has, however, "stress[ed] that a 'prison custodian is not the guarantor of a prisoner's safety. *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990)[.]" *Purcell ex rel. Estate of Morgan v. Toombs County, Ga.*, 400 F.3d 1313 (11th Cir. 2005). "Only '[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.' *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc).'" *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). "In order to state a § 1983 cause of action against prison officials based on a constitutional deprivation resulting from cruel and unusual punishment, there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to a constitutional stature." *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982).

At this juncture, Radford is required to produce sufficient evidence demonstrating (1) an objectively substantial risk of serious harm; (2) subjective awareness of this risk on the part of the defendants; (3) the defendants responded to such risk in an objectively

unreasonable manner; and (4) the actions/omissions of the defendants caused him to suffer injuries. *Farmer*, 511 U.S. at 837-838; *Marsh*, 268 F.3d 1028-1029; *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995). "The known risk of injury must be a strong likelihood, rather than a mere possibility before [an official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted); *Rich v. Bruce*, 129 F.3d 336, 339-340 (4th Cir. 1997) (Unless a prison official actually makes the inference that a substantial risk of serious harm exists and then disregards that risk, he does not act with deliberate indifference even though his actions violate prison regulations or can be described as stupid and lazy.). As the foregoing makes clear, mere negligence in providing protection to an inmate "does not justify liability under section 1983...." *Brown*, 894 F.2d at 1537.

The defendants deny they were aware of any facts prior to the time of the power outage that the emergency generator would fail. Thus, the difficulty for Radford is that he has submitted no evidence to show the defendants' subjective awareness of a significant risk of harm with respect to failure of the generator.

The undisputed facts of this case show that any risk of physical harm to Radford arising from a malfunctioning of the generator was only "a mere possibility" which precludes relief with respect to a claim of deliberate indifference. *Brown*, 894 F.2d at 1537. Radford "has [therefore] failed to establish that [any] Defendant had a subjective

awareness of a substantial risk of serious physical threat to Plaintiff[,] ... a required element of this claim.  When viewing the evidence most favorably toward Plaintiff, a claim for deliberate indifference has not been established."  *Carter*, 352 F.3d at 1350.  Finally, the record is devoid of any evidence showing that the defendants drew the necessary inference and thereafter ignored the risk to Radford' safety.  Under the circumstances of this case, "to find the Defendants sufficiently culpable would unduly reduce awareness to a more objective standard, rather than the required subjective standard set by the Supreme Court." *Carter*, 352 F.3d at 1350. Consequently, summary judgment is due to be granted in favor of the defendants on the deliberate indifference claim with respect to failure of the generator.

To the extent the complaint can be construed to allege that the defendants failed to immediately intervene when inmates gained control of certain areas of Bullock,  this claim likewise provides no basis for relief.  The defendants requested and obtained  assistance from the Certified Emergency Response Team, a tactical unit specially trained and outfitted to quell major disturbances, to respond to the mayhem and attempt to regain control of the facility.  The fact that the defendants did not interject themselves into a volatile situation where they would have been vastly outnumbered by inmates and which they were ill equipped to handle does not amount to deliberate indifference.  Correctional officials are "not required to risk their own welfare in order to protect [an inmate].  The Constitution

imposes a standard of human decency, not super human courage." *Stubbs v. Dudley*, 849

F.2d 83, 86-87 (2d Cir. 1988); *Morris v. Ward*, 2007 WL 951433, *1 (W.D. Mich. 2007)

(Eighth Amendment does not require a prison guard to intervene when intervention would

place the guard in danger of physical harm); *Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir.

2006) "[N]o rule of constitutional law requires unarmed officials to endanger their own

safety in order to protect a prison inmate threatened with physical violence.  The officers

violated no 'clearly established' law by falling to intervene while unarmed."); *Prosser v.

Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995) (no constitutional duty to intervene if doing so

would endanger guards' physical safety); *MacKay v. Farnsworth*, 48 F.3d 491, 493 (10th

Cir. 1995) (prison officials did not act with deliberate indifference when, in accordance

with prison policy, they called for additional staff before intervening in an inmate fight).

Under the circumstances of this case, the court finds no callous indifference in the actions

of the defendants and deems their response a reasonable one.  Consequently, the defendants

are entitled to summary judgment regarding their failure to intervene in the melee.

## L.  Conspiracies

Radford alleges that the correctional defendants have engaged in various

conspiracies to deprive him of his constitutional rights. "Conspiring to violate another

person's constitutional rights violates section 1983. *Dennis v. Sparks,* 449 U.S. at 27, 101

S.Ct. at 186 (1980); *Strength v. Hubert,* 854 F.2d 421, 425 (11th Cir.1988), *overruled in part*

*on other grounds by Whiting v. Traylor,* 85 F.3d 581, 584 n.4 (11th Cir.1996)."  *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283 (11th 2002).  "To prove a 42 U.S.C. § 1983 conspiracy, a plaintiff 'must show that the parties "reached an understanding" to deny the plaintiff his or her rights [and] prove an actionable wrong to support the conspiracy.' *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir.1990), *cert. denied,* 500 U.S. 932, 111 S.Ct. 2053, 114 L.Ed.2d 459 (1991)....  [T]he linchpin for conspiracy is agreement...." *Bailey v. Board of County Comm'rs of Alachua County*, 956 F.2d 1112, 1122 (11th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 58 (1992).  In order for a plaintiff "to establish the 'understanding' or 'willful participation' required to show a conspiracy, ... [he] must [produce] some evidence of agreement between the defendants....  For a conspiracy claim to survive a motion for summary judgment '[a] mere "scintilla" of evidence ... will not suffice; there must be enough of a showing that the jury could reasonably find for that party.' *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990)." *Rowe*, 279 F.3d at 1283-1284.  Merely "stringing together" adverse acts of individuals is insufficient to demonstrate the existence of a conspiracy.  *Harvey*, 949 F.2d at 1133.

The defendants deny they have conspired to violate Radford's constitutional rights and, instead, argue that they acted appropriately in addressing various negative behavior by Radford.  The court has carefully reviewed the pleadings filed by the plaintiff.  There is a total lack of evidence to support Radford's suppositious theory that the defendants

engaged in various conspiratorial acts against him.   Specifically, Radford has failed to present any evidence which demonstrates that the defendants "reached an understanding" to violate his rights or committed an "actionable wrong to support the conspiracy." *Bailey*, 956 F.2d at 1122; *Bendiburg*, 909 F.2d at 468.   At best, Radford's assertions are self-serving, purely conclusory allegations which fail to assert those material facts necessary to sufficiently plead a conspiracy between the defendants.   *Harvey*, 949 F.2d 1133; *Fullman*, 739 F.2d at 556-557.   Thus, the motions for summary judgment filed by the correctional defendants are due to be granted regarding this claim.   *Bailey*, 956 F.2d at 1122.

## M.  Medical Co-Payment

Radford complains that his constitutional rights were violated by assessment of a $3.00 co-payment for partial payment of costs attendant to his receipt of medical treatment. This action, standing alone, does not violate the Constitution.   The mere fact that Radford is charged a nominal fee or co-payment for medical treatment does not in any way deprive him of a protected right, privilege or immunity.  *Shapley v. Nevada Board of State Prison Commissioners*, 766 F.2d 404, 408 (9th Cir. 1985) (imposition of fee for medical treatment provided to an inmate does not amount to a constitutional violation); *Bester v. Wilson*, 2000 WL 1367984 at *8 (S.D. Ala. August 18, 2000) ("[T]he charging of a fee to prisoners for medical treatment from their [available] funds has been held to be constitutional when

challenged on several due process and Eighth Amendment grounds."). Radford does not allege nor is there any evidence indicating that he was denied medical treatment because he was unable to pay the fee; instead, the evidentiary materials submitted by the medical defendant establish that medical treatment is provided to inmates despite their inability to provide a co-payment. Since Radford has failed to allege a violation of his constitutional rights with respect to the assessment/collection of fees associated with medical treatment, the defendant is entitled to summary judgment on this claim.

### N. Violation of Administrative Rules and Regulations

Radford alleges that the defendants violated administrative regulations governing the restriction of funds in his account, disciplinary proceedings, use of state equipment, management/security of the facility, laundry bags, paper sacks/bags for canteen purchases and paper plates for microwave use. Infringements of agency rules, regulations or procedures do not, without more, amount to constitutional violations. *Magluta v. Samples,* 375 F.3d 1269, 1279 n. 7 (11th Cir. 2004) (mere fact governmental agency's regulations or procedures may have been violated does not, alone, raise a constitutional issue); *Myers v. Klevenhagen,* 97 F.3d 91, 94 (5th Cir. 1996) (claim that prison officials have not followed their own policies and procedures does not, without more, amount to a constitutional violation); *United States v. Caceres,* 440 U.S. 741, 751-752 (1979) (mere violations of agency regulations do not raise constitutional questions); *Weatherholt v. Bradley,* 316

F.App'x 300, 303 (4th Cir. 2009) (same); *see also Riccio v. Cnty. of Fairfax,* 907 F.2d 1459, 1459 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by its law is not a federal violation). Thus, this claim provides Radford no basis for relief.

## O. Denial of Medical Treatment by Dr. Siddiq

Radford complains that defenadnt Siddiq acted with deliberate indifference to ongoing pain in his lower back. *Amended Complaint - Doc. No. 23* at 12. Specifically, Radford asserts that Dr. Siddiq failed "to schedule plaintiff for further diagnostic treatment(s), and follow-up therapy by an out-patient facility" for the "inflammation, and injury present in his lower back" as recommended by an x-ray technician in 2012. *Id.* Dr. Siddiq adamantly denies that he acted with deliberate indifference to Radford's lower back condition and, instead, maintains that Radford received appropriate treatment for his back.

The evidentiary materials filed by Dr. Siddiq address the allegations made by Radford. A thorough review of these documents demonstrates that the affidavit submitted by Dr. Siddiq is corroborated by the objective medical records contemporaneously compiled with such treatment. In his affidavit, Dr. Siddiq addresses the claims presented against him as follows:

> I am familiar with Thomas Radford ("Mr. Radford"), an inmate formerly incarcerated at Bullock. A true and correct copy of the relevant excerpts from Mr. Radford's medical records are attached as Exhibit "A" to this Affidavit and my statements below include specific citations to the

Bates-labels affixed to the pertinent portions of Mr. Radford's medical records.

Upon arriving at any facility operated by the ADOC, inmates are notified of the procedures and processes for obtaining medical care and prescribed medications.   The Health Care Units within ADOC facilities generally rely upon the same procedures for obtaining emergency and non-emergency (i.e. sick call) medical treatment, conducting chronic care clinics, medication administration, segregation sick call and the like and permitting  an  inmates invocation of and participation in a grievance process. As part of this medical staffs orientation of inmates, inmates are provided a form entitled "ACCESS TO HEALTHCARE SERVICES."

When an inmate has a non-emergency medical or health problem and/or complaint at Bullock, an inmate may file a sick call request form in order to bring this problem or complaint to the attention of the medical staff and/or request  medical  treatment for this problem. The sick call request process is well-known at Bullock and is utilized by inmates on a daily basis. In the "ACCESS TO HEALTHCARE SERVICES" form, inmates are provided a complete description of the sick call process.  For inmates housed in general population areas, sick call request forms are available at the Health Care Unit and at various locations throughout the facility.

An inmate making a sick call request is required to complete the top portion of the sick call request form (stating his name, the date of request, AIS number, date of birth, dorm location, the nature of the problem or request and his signature).  The inmate then submits the sick call request form by placing it in one of the many locked boxes located throughout the facility.  The sick call request forms are removed from the locked boxes each day at approximately 12:00 p.m., brought to the Health Care Unit and marked  as received  by the medical records clerk or a nurse at that time.

Upon reviewing the sick call request forms, the medical staff compiles a list of inmates that have submitted sick call request forms and provides the list to the Alabama Department of Corrections officer assigned to the Health Care Unit.  The Health Care Unit officer summons the patients by radio. Sick call begins at 5:00a.m. Inmates who submit sick call request forms are responsible for reporting to the Health Care Unit for evaluation of their complaints. The nurse conducting sick call takes inmates' vital signs and either: (1) provides an inmate with medical treatment that can be provided under the nursing protocols, or (2) refers the inmate to the physician or nurse practitioner on staff at Bullock.  If an inmate submits more than one (1) sick

call request form on the same day, the nurse will only fill in the intake information on one (1) sick call request form regarding the inmate's subjective complaints, objective vital signs, assessment and plan.

A submitted sick call request form that is not completed by the medical staff indicates that an inmate failed to report when summoned to sick call. If the medical complaints or problems identified by an inmate in a sick call request form appear to be urgent or life- threatening, the medical staff will immediately have the inmate brought to the Health Care Unit for medical treatment, and the inmate will not be required to wait until sick call begins.

Inmates with chronic medical conditions at Bullock are also eligible to attend regularly scheduled evaluations called "chronic care clinics." Inmates are not charged any type of co-pay in order to attend a chronic care clinic. Chronic care clinics are held on approximately a quarterly basis for inmates diagnosed with a chronic medical condition such as hypertension, diabetes, hepatitis C, and chronic obstructive pulmonary disease. Chronic care clinics are designed to supplement the sick call procedure, and are not designed as a substitute for the primary care provided through the sick call procedure. These chronic care clinics are particularly important for inmates prescribed certain types of medications or treatments that require regular monitoring, such as diabetics receiving insulin on a sliding scale.

As set forth in the "ACCESS TO HEALTHCARE SERVICES" form, inmates receive prescribed medication through the process commonly referred to as "pill call." Pill call occurs for the general population at Bullock (i.e. inmates who are not housed in segregation) every day at 6 a.m. and 6 p.m. At these designated times, inmates line up outside of two pill call windows outside of the Health Care Unit. When the inmate arrives at the pill call window, he provides a member of the medical staff who is standing on the other side of the pill call window with his identification badge which is issued by the ADOC. The member of the medical staff then retrieves the inmate's medication which is organized alphabetically and punches the medication out of a medication blister pack into a small plastic cup. The medication is provided to the inmate who is required to immediately take the medication.

As the pill call process progresses, the medical staff conducting pill call records the disbursement of medication on forms known as "Medication Administration Records" or MARs. These MARs are maintained and filed in the individual inmates' medical records. Once the medications are

64

dispensed, the medical staff member records the dispensing of medication by placing his initial or initials in the space provided on the corresponding MAR. If an inmate does not report to pill call to retrieve his medication, the medical staff member will either (1) leave the form blank, or (2) place the letter "A" or "a" in the space provided, indicating the inmate was "absent." If the medical staff conducting pill call discovers an inmate's medication has run out, expired or cannot otherwise be dispensed to the inmate, the medical staff at Bullock is instructed to document the unavailability of medication and notify a supervisor or physician immediately.

In addition to the pill call process, some inmates at Bullock are permitted to maintain their prescription medications on their person and administer this medication without oversight from the medical staff. This process is known as "KOP" or "Keep on Person" medication administration which is a more efficient and sometimes more effective medication administration process. Certain medications for certain conditions cannot be administered through the KOP program, such as narcotics and certain psychotropic medications.

Like the other institutions with the ADOC system, the medical staff at Bullock maintains a well-established grievance procedure for any inmate who wishes to voice a complaint regarding any medical treatment he has sought or received during his incarceration at Bullock. The initial orientation process at Bullock also includes educating inmates as to the availability of the grievance process. The existence of Bullock's grievance procedure is well-known among the prison population, as indicated by the fact that ... the Health Services Administrator at Bullock, receives inmate requests and/or inmate grievances on a daily basis. The physicians, nurse practitioners, nurses and other medical personnel at Bullock attempt to resolve all inmate concerns prior to an "inmate grievance" being submitted. The grievance process is initiated when an inmate submits a Medical Grievance form to the Health Services Administrator through the institutional mail system. This request is reviewed by the Health Services Administrator who provides a written response within five (5) days of receipt of the Medical Grievance.

The medical staff's written response to a Medical Grievance is included on the bottom portion of the same form containing an inmate's Medical Grievance. Below the portion of the form designated for the "Response," the following notation appears:

> If you wish to appeal a grievance response you may file a <u>Grievance Appeal</u>. Return the completed form to the

65

> attention of the Health Services Administrator. You may
> place the form in the sick call request box or give it to the
> segregation sick call nurse on rounds.

As stated in the Medical Grievance forms, the second step of the grievance process involves the submission of a Medical Grievance Appeal (also referred to as an "Appeal"). Written responses to Medical Grievances and Medical Grievance Appeals are provided within five (5) days of receipt. Medical Grievance forms are available from the correctional officers at Bullock. Inmates are instructed to place completed Medical Grievance forms in the sick call boxes located throughout the facility. When received in the health care unit, Medical Grievance forms are sent to the Health Services Administrator by the medical records clerk or administrative assistant. The Health Services Administrator reviews the grievances daily, provides a written response within five days at the bottom of the form and returns a copy of the completed forms to the inmate. The Health Services Administrator at Bullock encourages inmates who have complaints about the medical care they have sought or received at Bullock to utilize this grievance process. ***During his incarceration at Bullock, Mr. Radford did not submit a single Medical Grievance or Medical Grievance Appeal, contesting or challenging in any way the care provided by the medical staff at Bullock***.

It is my understanding from reading Mr. Radford's Complaint that he is dissatisfied with the level of care afforded him at Bullock in regards to his alleged lower back discomfort. Specifically, Mr. Radford complains of the level of care provided between 2012 and the present. Based upon my review of Mr. Radford's medical records and the care I provided to Mr. Radford during his incarceration at Bullock, I can state to a degree of medical certainty that Mr. Radford received a more than adequate degree of medical treatment during his incarceration at Bullock. Moreover, I cannot find any reason for him to claim that the medical treatment afforded him has been anything less than complete, appropriate and acceptable in all respects.

The first time within the past two years that Mr. Radford expressed discomfort in his lower back was on May 14, 2012. Mr. Radford submitted a sick call request form on May 14, 2012, complaining of discomfort in his lower back. (COR059). The next day, on May 15, 2012, the medical staff evaluated Mr. Radford under the nursing protocols for his lower back discomfort. (COR057-58). At this evaluation, Mr. Radford stated that he experiences pain in his back when lying down, but the pain subsides when he is standing. (CMS057). Further, Mr. Radford stated that he was not in

pain at the time of the evaluation. (CMS057). After this evaluation, I did not believe that an x-ray of Mr. Radford's lower back was medically necessary. However, following this evaluation, I entered orders prescribing Mr. Radford with Ibuprofen (Advil) for twenty days. (COR024). During this twenty day prescription, Mr. Radford failed to report to pill call fifteen times to receive his prescribed medication. (COR118-121). This behavior is not uncommon for Mr. Radford. In fact, Mr. Radford routinely fails to report to pill call to receive his prescribed medications. (COR130; 133-136; 139-141).

In June of 2012, Mr. Radford again expressed complaints of lower back discomfort. (COR018). On June 11, 2012, Mr. Radford submitted a sick call request form for an issue unrelated to his back. (COR055). The medical staff evaluated Mr. Radford on June 12, 2012 under the nursing protocols. (COR053). At this evaluation, Mr. Radford expressed discomfort in his lower back. That same day, I entered orders prescribing Mr. Radford with a topical anti-inflammatory ointment (triamcinolone) for thirty days to alleviate his lower back discomfort. (COR024). Because of Mr. Radford's historic failure to appear at pill call to receive his prescribed medication, Mr. Radford received this prescription ointment through the KOP program. (COR018; 116).

Mr. Radford submitted a sick call request form on June 24, 2012, seeking a refill of his prescription topical anti-inflammatory ointment. (COR050). The medical staff evaluated Mr. Radford under the nursing protocols on June 25, 2012. (COR051-52). That same day, I entered orders extending Mr. Radford's anti-inflammatory ointment prescription for twenty more days. (COR024). Again, Mr. Radford received this prescription ointment through the KOP program. (COR017).

On September 4, 2012, Mr. Radford submitted a sick call request form complaining of abdominal pain and lower back discomfort. (COR048). The medical staff evaluated Mr. Radford under the nursing protocols on September 5, 2012 and referred Mr. Radford to me for further evaluation. (COR-046-47). That same day, I conducted a physical examination of Mr. Radford regarding his abdominal pain and lower back discomfort and I noticed no indications of trauma, injury or damage to Mr. Radford's lower back. However, that same day, I entered orders for Mr. Radford to undergo a lateral diagnostic x-ray. (COR024; 28). Mr. Radford underwent the ordered lateral diagnostic x-ray on September 5, 2012. (COR083). The radiology report generated following this procedure states "the skeleton

67

included in the examination is unremarkable." (COR083). Contrary to the allegations contained in Mr. Radford's Complaint, nothing in this radiology report suggests that Mr. Radford should undergo further diagnostic treatment or follow-up out-patient therapy. The September 5, 2012, lateral diagnostic x-ray is the only x-ray Mr. Radford underwent in 2012.

On February 18, 2013, Mr. Radford submitted a sick call request form to request a bottom bunk profile. (COR045). The medical staff marked this sick call request form as received that same day and scheduled Mr. Radford for sick call on February 19, 2013. (COR045). However, Mr. Radford failed to appear when summoned to sick call on February 19, 2013. (COR014; 45).

On February 21, 2013, Mr. Radford again submitted a sick call request form to request a bottom bunk profile. (COR044). The next day, on February 22, 2013 the medical staff evaluated Mr. Radford under the nursing protocols. (COR042-43). That same day, I entered orders for Mr. Radford to receive his requested bottom bunk profile for 180 days. (COR013; 23).

Mr. Radford submitted a sick call request form on May 21, 2013, requesting a back brace for his lower back discomfort. (COR040). The next day, on May 22, 2013, the medical staff evaluated Mr. Radford under the nursing protocols and referred Mr. Radford to me for further evaluation. (COR038-39). I physically examined Mr. Radford regarding his lower back discomfort that same day and I noticed no indications of trauma, injury or damage to Mr. Radford's lower back. Following this examination, I entered orders for Mr. Radford to receive his requested back brace for 180 days. (COR012; 23; 26).

On June 10, 2013, Mr. Radford submitted a sick call request form regarding his lower back discomfort. (COR035). The medical staff evaluated Mr. Radford under the nursing protocols on June 11, 2013, and referred Mr. Radford to me for further evaluation. (COR036-37). I conducted a physical examination of Mr. Radford regarding his lower back discomfort that same day and again I noticed no indications of trauma, injury or damage to Mr. Radford's lower back. (COR207). However, following this evaluation, I entered orders for Mr. Radford to undergo a diagnostic lumbar spinal x-ray and to receive an anti-inflammatory injection (solumediol). (COR023).

Mr. Radford underwent the ordered lumbar spinal x-ray on June 12, 2013. (COR074). The radiology report generated following this procedure states the "vertebral bodies of [Mr. Radford's] lumbar spine demonstrate normal height and alignment." (COR074). In addition, the radiology report

states "there is no fracture or any bony destructive lesion." (COR074).  The radiology report concludes that Mr. Radford exhibited a "normal lumbar spine series." (COR074).  In sum, at the time of this diagnostic x-ray.  Mr. Radford did not exhibit any signs or symptoms of trauma, injury or damage to his lower back or lumbar spine.  Therefore, in my medical opinion, no medical reason existed for Mr. Radford to undergo further evaluation or examination for his lower back discomfort.

On June 19, 2013, Mr. Radford again submitted a sick call request form regarding his lower back discomfort.  (COR034).  The medical staff evaluated Mr. Radford under the nursing protocols on June 20, 2013 and referred Mr. Radford to me for further evaluation. (COR032-33). I physically examined Mr. Radford that same day regarding his lower back discomfort and again I noticed no indications of trauma, injury or damage. (CMS025). Following the examination, I entered orders prescribing Mr. Radford with Naproxen (Aleve) for ten days.  (CMS025).  To the extent Mr. Radford continues to express complaints regarding his lower back discomfort, I, and the medical staff at Bullock, will continue to provide Mr. Radford with the necessary medical attention, care and treatment.

Based upon the medical care and treatment provided to Mr. Radford, I simply do not agree with the allegations included in his Complaint.  With regard to Mr. Radford's specific allegations, I did not neglect him in any way when he voiced complaints regarding his lower back discomfort. To the contrary, I treated Mr. Radford's pain and inflammation, provided Mr. Radford with his requested "bottom bunk" profile and back brace and ordered an x-ray to ensure that I considered all possible injuries.  I did not at any time ignore any request by Mr. Radford for medical treatment while he was under my care.  I did not and have not deliberately ignored any medical complaints made by Mr. Radford or interfered in any way with the provision of medical care to Mr. Radford at any time.  I have not taken any action which has caused Mr. Radford to experience any unnecessary pain and/or suffering.  At all times during his incarceration at Bullock [until his transfer from this facility in early July of 2013], I listened to Mr. Radford's complaints, undertook thorough physical examinations of him and provided directives and medication when appropriate to control the symptoms which he communicated to me.  I can state to a reasonable degree of medical certainty that the members of the medical staff at Bullock have provided Mr. Radford with all of the necessary medical attention, care and treatment which he required and even provided additional care in an effort to increase his

overall level of comfort.

*Medical Defendant's Exhibit 1 - Doc. No. 45-1* at 2-11 (paragraph numbering omitted and

emphasis in original).   In addition, an x-ray performed on February 14, 2014, after

Radford's transfer from Bullock, indicated only "[m]ild degenerative disease ... in every

interspace of the lumbar spine with bone density normal.   No malalignment, fracture or

bone destruction is identified.  There is a mild dextrocurvature of the spine.  A benign bone

lesion is seen in the left ilium with SI joints normal." *Exhibit A to Defendant Siddiq's May*

*23, 2014 Response to Discovery Request - Doc. No. 276* at 8.  The radiologist concluded

that Radford suffered "Mild DDD [Degenerative Disk Disease] and dextroscoliosis with

nothing acute in the lumbar spine." *Id*.

Dr. Siddiq denies he acted with deliberate indifference to Radford's lower back pain

and likewise maintains that Radford failed to exhaust the administrative remedy provided

via the medical care provider prior to filing this complaint as required by the Prison

Litigation Reform Act, 42 U.S.C. § 1997e(a).  "When deciding whether a prisoner has

exhausted his remedies, the court should first consider the plaintiff's and the defendants'

versions of the facts, and if they conflict, take the plaintiff's version of the facts as true.

'If in that light, the defendant[s] [are] entitled to have the [unexhausted claims] dismissed

for failure to exhaust administrative remedies, [the claims] must be dismissed.' *Turner v.*

*Burnside,* 541 F.3d 1077, 1082 (11th Cir.2008) (citing *Bryant* [*v. Rich*, 530 F.3d 1368,

1373-1374 (11th Cir. 2008)]). If the complaint is not subject to dismissal at this step, then the court should make 'specific findings in order to resolve the disputed factual issues related to exhaustion.' *Id.* (citing *Bryant,* 530 F.3d at 1373-74, 1376)." *Myles v. Miami-Dade County Correctional and Rehabilitation Dept.*, 476 F.App'x 364, 366 (11th Cir. 2012).

In his response to Dr. Siddiq's report, Radford takes issue with the course of treatment provided for his back and argues that he should have been referred to a specialist for evaluation and treatment. *Plaintiff's Response - Doc. No. 299* at 2-5. Radford also explains that he did not appear at pill call to receive his prescription(s) for Ibuprofen because he purchased this medication from the canteen to avoid the "long lines at pill call." *Id*. at 1. Radford, however, does not dispute his failure to properly exhaust the administrative remedy provided by the medical care provider nor does he present any evidence of proper exhaustion.

(i)  Exhaustion of Administrative Remedies.  The Prison Litigation Reform Act compels exhaustion of available administrative remedies before a prisoner can seek relief in federal court on a § 1983 complaint. Specifically, 42 U.S.C. § 1997e(a) states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." "Congress has

provided in § 1997(e)(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative remedies." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of all available administrative remedies is a precondition to litigation and a federal court cannot waive the exhaustion requirement. *Booth*, 532 U.S. at 741; *Alexander v. Hawk*, 159 F.3d 1321, 1325 (11th Cir. 1998); *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378 (2006). Moreover, "the PLRA exhaustion requirement requires *proper exhaustion*." *Woodford*, 548 U.S. at 93, 126 S.Ct. at 2387 (emphasis added). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules [as a precondition to filing suit in federal court] because no adjudicative system can function effectively without imposing some orderly structure on the courts of its proceedings.... Construing § 1997e(a) to require proper exhaustion ... fits with the general scheme of the PLRA, whereas [a contrary] interpretation [allowing an inmate to bring suit in federal court once administrative remedies are no longer available] would turn that provision into a largely useless appendage." 548 U.S. at 90-91, 93, 126 S.Ct. at 2386-2387. The Court reasoned that because proper exhaustion of administrative remedies is necessary an inmate cannot "satisfy the Prison Litigation Reform Act's exhaustion requirement ... by filing an

untimely or otherwise procedurally defective administrative grievance or appeal[,]" or by effectively bypassing the administrative process simply by waiting until the grievance procedure is no longer available to him. 548 U.S. at 83-84, 126 S.Ct. at 2382; *Johnson v. Meadows*, 418 F.3d 1152, 1157 (11th Cir. 2005) (inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion requirement of the PLRA). "The only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint." *Smith v. Terry*, 491 F.App'x 81, 83 (11th Cir. 2012) (per curiam). Even where an inmate litigant "attempt[s] to amend or supplement his original complaint" regarding efforts at subsequent exhaustion, it does "not change the important historical fact: his administrative remedies were unexhausted when he filed his original complaint. Therefore, he cannot cure the exhaustion defect." *Id*.

The record in this case is undisputed that the health care provider for the Alabama Department of Corrections provides a grievance procedure for inmate complaints related to the provision of medical treatment. The evidentiary materials submitted by Dr. Siddiq further demonstrate that Radford failed to file a requisite grievance challenging the medical treatment referenced in the instant complaint.

Radford does not dispute his failure to exhaust the administrative remedy available to him for his medical treatment claim prior to filing this case which is a precondition to

73

proceeding before this court on such claims. *Ngo*, 548 U.S. at 87-94, 126 S.Ct. at 2384-2388. Radford has presented no circumstances which justify his failure to exhaust the grievance procedure provided by the medical care provider. Under these circumstances, the court finds that the deliberate indifference claim presented in this cause of action against Dr. Siddiq is subject to dismissal for Radford's failure to exhaust an administrative remedy, *Ngo*, *supra*, and that dismissal with prejudice as to the exhaustion defense is appropriate. *Bryant*, 530 F.3d at 1375 n.1 (acknowledging that where administrative remedies are clearly time barred or otherwise infeasible inmate's failure to exhaust may "correctly result in a dismissal with prejudice."); *Marsh v. Jones*, 53 F.3d 707, 710 (5th Cir. 1995) ("Without the prospect of a dismissal with prejudice, a prisoner could evade the exhaustion requirement by filing no administrative grievance or by intentionally filing an untimely one, thereby foreclosing administrative remedies and gaining access to a federal forum without exhausting administrative remedies."); *Johnson*, 418 F.3d at 1157 (same); *Berry v. Kerik*, 366 F.3d 85, 88 (2nd Cir. 2004) (footnotes omitted) (indicating inmate's "federal lawsuits ... properly dismissed with prejudice" where previously available "administrative remedies have become unavailable after prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust.").

(ii) <u>Deliberate Indifference to Back Condition</u>. Even had Radford exhausted his administrative remedies with respect to his medical treatment claim, the court finds that

Radford is nonetheless entitled to no relief as he has failed to establish deliberate indifference by Dr. Siddiq.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that the defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986). Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal quotations omitted) (As directed by *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment."

> That medical malpractice-negligence by a physician-is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105-07, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir.1995). Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833-38, 114 S.Ct. 1970, 1977-79, 128 L.Ed.2d 811 (1994); *Cottrell v. Radford,* 85 F.3d 1480, 1491 (11th Cir.1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191

> n. 28 (11th Cir.1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir.1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to set forth a cognizable claim of "deliberate indifference to [a] serious medical need ..., Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-1307 (11th Cir. 2009). When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, defendant must know of and then disregard an excessive risk to prisoner's health or safety). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding

of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk

that he should have perceived but did not, while no cause for commendation, cannot under

our cases be condemned as the infliction of punishment."  *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate
> indifference, ... the Supreme Court has ... emphasized that not 'every claim
> by a prisoner that he has not received adequate medical treatment states a
> violation of the Eighth Amendment.'  *Estelle,* 429 U.S. at 105, 97 S.Ct. at
> 291; *Mandel,* 888 F.2d at 787.  Medical treatment violates the eighth
> amendment only when it is 'so grossly incompetent, inadequate, or excessive
> as to shock the conscience or to be intolerable to fundamental fairness.'
> *Rogers,* 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence
> or malpractice do not rise to the level of constitutional violations.  *See
> Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice states does not
> become a constitutional violation merely because the victim is a prisoner.');
> *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not
> sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033
> (mere medical malpractice does not constitute deliberate indifference).  Nor
> does a simple difference in medical opinion between the prison's medical
> staff and the inmate as to the latter's diagnosis or course of treatment support
> a claim of cruel and unusual punishment.  *See Waldrop,* 871 F.2d at 1033
> (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation

and internal quotations omitted) (To show deliberate indifference to a serious medical

need, a plaintiff must demonstrate that [the] defendants' response to the need was more

than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical

malpractice actionable under state law.").  Moreover, "as *Estelle* teaches, whether

government actors should have employed additional diagnostic techniques ... 'is a classic

example of a matter for medical judgment' and therefore not an appropriate basis for

grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545; *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a different mode of diagnosis does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient). Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records. *See Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

The affidavit and medical records submitted by Dr. Siddiq thoroughly address the claim made by Radford alleging a lack of adequate medical treatment for his lower back. A thorough review of the medical records demonstrates that Dr. Siddiq's affidavit is corroborated by the objective medical records compiled contemporaneously with treatment provided to Radford relative to the instant claim of deliberate indifference.

Under the circumstances of this case, the court concludes that the course of treatment undertaken by Dr. Siddiq in addressing Radford's back condition did not violate this inmates' constitutional rights. The medical care Radford received was certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be

intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505. The allegations presented by Radford simply fail to establish deliberate indifference by Dr. Siddiq. *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Adams*, 61 F.3d at 1545-1546 (Whether medical personnel "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis" on which to ground constitutional liability. In addition, an inmate's allegation that a prison physician failed to diligently pursue alternative means of treating his condition "did not 'rise beyond negligence'... to the level of deliberate indifference."); *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

It is undisputed that Radford received treatment for his complaints regarding back pain and had access to health care personnel throughout his confinement at Bullock. It is likewise evident that health care personnel, including Dr. Siddiq, rendered treatment to Radford in accordance with their professional judgment. Moreover, Radford has failed to present any evidence which indicates that Dr. Siddiq knew that the manner in which he provided treatment created a substantial risk to Radford's health and that with this

knowledge consciously disregarded such risk.   The record contains no evidence, significantly probative or otherwise, showing that Dr. Siddiq acted with deliberate indifference to Radford's complaints regarding back pain.   Consequently, summary judgment is due to be granted in favor of Dr. Siddiq.   *Carter*, 352 F.3d at 1350.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motions for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be DISMISSED with prejudice.

4.  The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that on or before March 16, 2016 the parties may file objections to this Recommendation.  Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from

attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc*., 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 1st day of March, 2016.


/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE